*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* NEELY/FERGUSON, Minors.

UNPUBLISHED
August 18, 2022

No. 360004
Washtenaw Circuit Court
Family Division
LC Nos. 19-000086-NA;
　　　　19-000087-NA;
　　　　19-000088-NA;
　　　　19-000089-NA;
　　　　20-000046-NA

Before: GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's orders terminating her parental rights to her minor children, KN, GN, MN, LN, and SF, under MCL 712A.19b(3)(b)(*ii*) (parent failed to prevent physical injury or physical abuse), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

On August 27, 2019, respondent called 911 and reported two-month-old MN was unresponsive and not breathing. Respondent reported KN, GN, MN, and LN's legal father dropped MN in the early morning hours of August 27, 2019.[1] The children were transported to the hospital. MN was diagnosed with a skull fracture, brain bleeding and bruising, multiple rib fractures that were in the early stages of healing, and retinal hemorrhages. MN also had bruising on his face and body. Additionally, MN and LN, twins who were born at an estimated 30 weeks gestation, were malnourished and "both below the first percentile for their weight and their gestational age[s]." KN and GN exhibited signs of abuse, and law enforcement determined KN,

---

[1] KN, GN, MN, and LN's legal father released his parental rights to the children during the proceedings. He is not a party to this appeal. SF's legal father had not been determined at the time of termination.

GN, MN, and LN were subjected to abhorrent living conditions, which consisted of a motel room that smelled of urine and garbage and contained rotting food, flies, feces, and other unsafe and unsanitary conditions.

Petitioner filed a petition concerning KN, GN, MN, LN, alleging they had been subjected to abuse and neglect. Petitioner requested the trial court authorize the petition; remove KN, GN, MN, LN from respondent's care and custody; exercise jurisdiction; and terminate respondent's parental rights. After a preliminary hearing, the trial court authorized the petition and placed KN, GN, MN, LN in foster care. Respondent's parenting time was suspended, and she was subsequently criminally charged. The trial court held the Department of Health and Human Services (DHHS) was not required to make reasonable efforts toward reunification because aggravated circumstances existed under MCL 712A.19a(2). KN and GN were placed in the same foster home, and MN and LN were placed in a separate foster home from KN and GN after they were released from the hospital.

Respondent filed a jury demand, and the adjudication trial was adjourned multiple times because of respondent's pending criminal matter and the COVID-19 pandemic. In May 2021, respondent gave birth to SF. Petitioner filed a petition with respect to SF, requesting the trial court authorize the petition, remove SF from respondent's care and custody, exercise jurisdiction, and terminate respondent's parental rights to SF. After a preliminary hearing, the trial court authorized the petition and placed SF in foster care. The trial court held DHHS was not required to make reasonable efforts toward reunification with respect to SF because aggravated circumstances existed. SF was placed in the same nonrelative foster home as KN and GN.

The adjudication trial was held over the course of several days in September 2021, and a jury found grounds for the trial court to exercise jurisdiction. The termination hearing was held over the course of several days in December 2021 and January 2022. Respondent testified she voluntarily participated in services to address her parenting skills and her history with domestic violence during the proceedings. Respondent also testified about her employment and housing. Extensive evidence was presented concerning KN, GN, MN, LN's special needs as a result of the trauma they endured while in respondent's care, and Dr. Sheila Marcus testified about the effects of trauma on children. It was noted SF, who was removed from respondent immediately after she was born, was the only child who did not require extensive services and who did not have developmental delays. Multiple witnesses opined that termination was in the children's best interests. At the close of proofs, the trial court found grounds for termination were established under MCL 712A.19b(3)(b)(*ii*), (g),[2] and (j), and termination of respondent's parental rights was in the children's best interests. This appeal followed.

---

[2] We disagree with the lawyer-guardian ad litem that the trial court failed to make sufficient findings with respect to MCL 712A.19b(3)(g). See MCR 3.977(I)(1) (only requiring "[b]rief, definite, and pertinent findings and conclusions on contested matters").

## II. ANALYSIS

Respondent argues that the trial court clearly erred by finding clear and convincing evidence supporting termination under MCL 712A.19b(3)(b)(*ii*), (g), and (j). We find no clear error warranting reversal.

"We review for clear error the trial court's finding that there are statutory grounds for termination of a respondent's parental rights." *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos. 358502 and 358503); slip op at 5. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted).

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *Id*. We conclude the trial court did not clearly err by finding termination of respondent's parental rights was proper under MCL 712A.19b(3)(j), which provides:

> There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The harm contemplated under (j) includes emotional harm, as well as physical harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

At the time of termination, respondent had housing. However, she did not have a written lease agreement, did not pay rent, and the property had $2,000 in outstanding property taxes. Respondent also acknowledged the children's rooms were not ready and required additional work before they would be suitable. Homelessness and unsuitable living conditions undoubtedly have traumatic effects on children, and KN, GN, MN, and LN had already been traumatized by their previous unsuitable living conditions.

Additionally, KN, GN, MN, and LN have extensive special needs as a result of the abuse and neglect they endured while in respondent's care, and it was essential they attend their myriad of services and medical appointments to continue progressing. According to Dr. Marcus, managing their care is "really challenging" and "almost requires an advanced degree" because it is "very difficult to negotiate the systems of care, the insurance issues, the transportation issues, [and] the logistic issues with getting these kids to their appointments." At the time of termination, respondent did not have health insurance or a vehicle large enough to transport all the children. Respondent was also unfamiliar with the children's services, their service providers, and their doctors despite having access to their medical records. While respondent testified she would be able to "juggle" the children's appointments, respondent was the sole employee at her landscaping business and she worked part-time at a restaurant. There is no indication respondent had consistent, specialized childcare.

The children also required close supervision. They were all less than five years old, and KN, GN, MN, and LN had cognitive delays. KN and GN often attempted to engage in dangerous activities such as running into traffic, MN and LN "got into things" together and ate books if given

the opportunity, and SF was mobile. The children's respective foster mothers noted the challenges associated with supervising the children and ensuring they attended their appointments, which occurred multiple times each week. The foster mothers attributed their success to the help of their spouses. Additionally, KN had food insecurity and would attempt to steal food from others, while GN lacked muscle tone because of his cerebral palsy and required an extended amount of time to eat. Respondent only offered vague and unrealistic explanations as to how she would manage the children and their extensive needs on her own, and she demonstrated an inability to understand some of the children's extensive special needs. The caseworker did not believe respondent would be able to manage the children without a degradation in their care and opined "balancing all five [children] at once with one person . . . would be extremely difficult if not impossible."

Additionally, evidence supports the children would suffer emotional harm if returned to respondent. The children had healthy, secure attachments with their respective foster parents. Dr. Marcus opined that disrupting "their current attachment relationship[s]" would disrupt their cognitive development because they would have to work "on developing and forming a new attachment relationship" with respondent. Dr. Marcus believed it would be "very hard" for the children's foster parents to encourage them to have an attachment to respondent, which would damage the secure attachment and cause emotional harm to the children.

KN, GN, MN, and LN could also be retraumatized by being exposed to respondent. Dr. Marcus had seen "time and time again" abused children being "triggered" by the reintroduction of a parent who was "involved in trauma." Specifically, the children would demonstrate a "significant upsurge in the fight or flight systems," which manifests itself in "sleep disruption, appetite dysregulation, behavioral outbursts, [and] crying. . . ." Dr. Marcus also found it unlikely the children ever formed a secure bond with respondent because they were removed from her care at such young ages. KN, GN, MN, and LN had not seen respondent in 2-1/2 years, and 19-month-old SF had not seen respondent since she was born. Dr. Marcus testified that the children would have to be reintroduced to respondent slowly over the course of months or years, but she did not recommend it.

Even if the children successfully formed a secure bond with respondent over time, it is unlikely respondent would be able to effectively parent them given the extensive trauma KN, GN, MN, and LN sustained in respondent's care. Dr. Marcus testified "the best healer of childhood trauma is having a caregiver who's both astute and sensitive and comfortable at reading the child's cues and aware of what their own history and background is so that their own history doesn't get in the way of reading those child's cues." Dr. Marcus opined that respondent would have difficulty looking past her own trauma and may also have a "traumatic response" to being reintroduced to the children. Specifically, it may result in "fears and sadness and anger" "flooding back," which would make it difficult for respondent to pay attention to the children's subtle cues and meet their needs. Respondent may also blame the children for her "sense of guilt and sadness."

Importantly, at the termination hearing, respondent acknowledged she continued to struggle with nightmares and low self-worth and required individual therapy to help her address "self care" and "focus." This evidence supports that respondent lacked the necessary parenting skills, which would impede the children's progress. Dr. Marcus also testified she "would have significant concern about an attempted reunification with children who had experienced this level of trauma" and noted traumatized children require "sensitive, stable, consistent care," which

respondent could not provide. Additionally, respondent had not fully addressed her long-term issues with entering into unhealthy relationships. Exposure to domestic violence would undoubtedly emotionally impact the children and had already negatively impacted KN, GN, MN, and LN. Respondent struggled to take responsibility for her role in their trauma during the proceedings. Because there is a reasonable likelihood the children would experience harm if returned to respondent, the trial court's finding that termination of respondent's parental rights was proper under MCL 712A.19b(3)(j) was not clearly erroneous. Because termination was proper under (j), we need not specifically consider the additional grounds upon which the trial court based its decision. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

Affirmed.

/s/ Michael F. Gadola
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly